**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

KELLIE GILLOM,

        Plaintiff,

v.                                        Case No. 04-CV-74095-DT

RALPH THAYER AUTOMOTIVE LIVONIA,
INC.,

        Defendant.

_____/

**ORDER GRANTING IN PART PLAINTIFF'S "MOTION FOR PARTIAL SUMMARY
JUDGMENT" AND GRANTING IN PART DEFENDANT'S "MOTION FOR SUMMARY
JUDGMENT"**

      Pending before the court are Plaintiff's "Motion for Partial Summary Judgment"

and Defendant's "Motion for Summary Judgment."  The court conducted a hearing in

this matter on January 11, 2006.  For the reasons stated below, the court will grant in

part Plaintiff's motion and grant in part Defendant's motion.[1]

**I. BACKGROUND**

      On or about June 21, 2004, Plaintiff Kellie Gillom went to Defendant Ralph

Thayer Automotive Livonia, Inc. ("RTAG")[2] to buy a car and turn in her leased 2001

Chrysler Voyager Vehicle ("Voyager").  (Pl.'s 2nd. Aff. at ¶ 1.)  Plaintiff and RTAG

entered into a contract for Plaintiff to purchase a 2004 Hyundai Elantra ("Elantra") and

---

      [1]The court's disposition of the parties' motions was significantly delayed by the
state of the briefing in this matter.  Neither party fully explained their positions and the
court was forced to ferret through the parties' respective contentions.  Thus, to the
extent that a party's position was unascertainable, the court denied its motion.

      [2]Defendant refers to itself as Ralph Thayer Automotive Group, therefore, the
court will use the abbreviation "RTAG" when referring to Defendant.

for Defendant to accept her Voyager as a trade-in.  (Def.'s Mot. at Ex. A, Retail

Installment Contract ("Contract").)  The Contract did not include among its terms any

express conditional terms.  (*Id.*)  Plaintiff has testified that she was "verbally promised"

by a representative of RTAG that she was "approved for credit" and Defendant "would

pay off [her] lease."  (Pl.'s 2nd Aff. at ¶ 3.)

Plaintiff avers that she was present when a RTAG salesperson called Chrysler

Financial for a payoff amount on the Voyager.  (*Id.* at ¶ 10.)  Plaintiff contends that this

salesperson knew that the Voyager was titled under her maiden name, "Henderson,"

because she explained this to her and she heard the salesperson use the name "Kellie

Henderson" in her conversation with Chrysler Financial.[3]  (*Id.*)  Plaintiff also maintains

that when the salesperson was on the phone with Chrysler Financial, she

"acknowledged that she knew [Plaintiff] was behind a payment on the Voyager and said

something like 'That's O.K.  We're going to pay it off.'"  (*Id.* at ¶ 11.)

Plaintiff also asserts that "when [an RTAG] manager had [her] sign the

documents, she flipped each one up and rushed through the process so that most of the

pages were covered up" and she "did not get to review the documents before [she]

signed them, nor did [she] get a copy of any documents prior to signing them."  (*Id.* at ¶

12.)  Plaintiff claims that the manager "did not give [her] a copy of the retail installment

contract or any other document to take with [her], . . . did not tell [her] that [she] could

take the document with [her] to review before signing it; [and] did not tell [her] that [she]

could take the document with [her] to use to shop for credit on other terms."  (*Id.* at ¶

---

[3]At all times that Plaintiff leased the Voyager it was in Plaintiff's maiden name,
"Kellie Henderson."  (*Id.* at ¶ 8.)

13.)  Besides her claim that she did not read or receive the documents she signed
before leaving the dealership, Plaintiff also complains that if she had reviewed the
documents before signing them, she would not have agreed to a 19.95% annual
percentage rate which was a term of her contract.  (*Id.* at ¶ 18.)  Plaintiff also asserts
that "[e]ven though the contract states a down payment of $1,500.00, [she] never paid
$1,500.00 in a down payment," and one of RTAG's employees instructed her to "lie" if
the bank called her and asked if she "really put down $1,500.00."  (*Id.* at ¶¶ 20-21.)

Plaintiff further alleges that on June 22, 2004, her husband picked up the car.
(*Id.* at ¶ 16.)[4]  RTAG later submitted Plaintiff's credit application to third parties,
including Equifax, Trans Union, and Experian, in an effort, Plaintiff claims, to "shop
[Plaintiff's] contract around for better terms for itself."  (Pl.'s Resp. to Def.'s 1st Mot. at
Exs. 4-6; *see also* Pl.'s Mot. at vi.)  During RTAG's interaction with Consumer Portfolio
Services ("CPS"), CPS communicated to RTAG that RTAG's "contract [with Plaintiff]
look[ed] absolutely fine, with the exception that that Chrysler Voyager has got to come
off of this section in [the] Purchase Agreement."  (Thayer Dep. at 103.)[5]  Plaintiff argues
that RTAG was not "legally nor contractually bound to assign or sell the retail installment
contract [with Plaintiff] to a third party lender, but could have held the paper itself and

_____

[4]At the hearing conducted in this matter, defense counsel asserted that there
was confusion (on the part of both parties) on the actual dates that these events took
place.  (Hrg. Transcript at 5.)  Using days of the week as relative time markers, defense
counsel stated that Plaintiff "visited on a Friday," "got a call on a Saturday" stating that
the dealership could work out a deal for her and on Monday went to the dealership to
sign the contract. On the following Friday Plaintiff's husband took possession of the
vehicle.  (*Id.*)

[5]Adam Thayer is one of three shareholders of RTAG and participates in the day-
to-day activities of the dealership.  (Thayer Dep. at 12.)

3

accepted payments from Mrs. Gillom." (Pl.'s Mot. at ¶ 14; *see also* Pl.'s Mot. at Ex. 16, Letter from Murray Brown Relating to "Spot Delivery;" Thayer Dep. at 110.)

Plaintiff argues that on June 25, 2004, four days after the Contract was signed, J.T. Wilcoxen, RTAG's special finance manager, discussed with CPS a payment increase. (Pl.'s Mot. at viii, Ex. 15, CPS's Rule 26(a)(1) Disclosures.) After Plaintiff took delivery of the vehicle, she received a phone call from an agent of RTAG. During this conversation, she was told that her "financing did not go through because the dealership didn't charge [her] enough for the vehicle" and she was asked "to come back [to the dealership] and sign a new contract with a higher monthly payment." (Pl.'s 2nd Aff. at ¶ 22.) Plaintiff refused to sign a contract with what she viewed to be less favorable payment terms. On June 29, 2004, RTAG ordered that the Elantra be repossessed. (Thayer Dep. at 209-13.) On July 8, 2004, Adam Thayer sent Plaintiff a letter stating that she had to sign a new contract because her name did not appear on the title for the Voyager. (Pl.'s Resp. to Def.'s 1st Mot. at Ex. 7, Letter From Adam Thayer.) On July 13, 2004, RTAG's attorney sent Plaintiff another letter, stating that she had to sign a new contract because her lease information was not correct. (Pl.'s Resp. to Def.'s 1st Mot. at Ex. 9, Letter from Suzanne Bartos.) Adam Thayer testified that if Plaintiff had "come in and sign[ed] [the] contract [that did not] mention . . . the lease turn-in," the deal would have gone through. (Thayer Dep. at 125.) On July 17, 2004, RTAG repossessed the Elantra. (Pl.'s Resp. to Def.'s 1st Mot. at Ex. 11.) Plaintiff asserts that no notice of any kind was provided to Plaintiff by RTAG relating to its "intent to dispose of property from Ralph Thayer" or "any adverse action" it planned to take. (Gillom 2nd Aff. at ¶¶ 24-25; Thayer Dep. at 58.)

4

Plaintiff brought this action against RTAG under seven theories: the (I) Truth in Lending Act, (II) Equal Credit Opportunity Act, (III) Fair Credit Reporting Act Adverse Action Notice, (IV) Statutory Conversion, (V) Motor Vehicle Sales Finance Act, (VI) UCC Article 9, and the (VII) Motor Vehicle Installment Sales Contract Act. (Pl.'s Compl. at ¶¶ 61-128.)[6]

## II.  STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The existence of some factual dispute, however, does not defeat a properly supported motion for summary judgment; the disputed factual issue must be material. *See id.* at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the

---

[6]On July 13, 2005, the court entered an "Opinion and Order Granting in Part and Denying In Part Defendant's 'Motion for Summary Judgment.'" In that order, the court granted Defendant's April 1, 2005 summary judgment motion [Dkt. # 23] as to Count IV of Plaintiff's complaint.

plaintiff is entitled to a verdict-'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'").  A fact is "material" for purposes of summary judgment when proof of that fact would have the effect of establishing or refuting an essential element of the claim or a defense advanced by either party.  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

In considering a motion for summary judgment, the court must view the facts and draw all reasonable inferences from the admissible evidence presented in a manner most favorable to the nonmoving party.  *Dunigan v. Noble*, 390 F.3d 486,492 (6th Cir. 2004) ("[W]e must determine 'not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it upon whom the *onus* of proof is imposed.'") (citation omitted).  The court does not weigh the evidence to determine the truth of the matter, but must determine if the evidence produced creates a genuine issue for trial.  *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003).

### III.  DISCUSSION

### A.  Count I - Truth in Lending Act ("TILA")

Defendant has moved for summary judgment on Plaintiff's TILA claim, which asserts that RTAG (1) failed to provide required TILA disclosures, (2) failed to accurately disclose the applicable finance charge, (3) failed to accurately disclose and itemize the amount financed, (4) misstated the applicable APR, (5) falsely inflated the value of the 2001 Voyager trade-in, (6) inflated the cash price of the vehicle, (7) falsely inflated the value which was added to the vehicle purchased from RTAG, (8) falsely and

6

inaccurately disclosed the additional sales tax as an amount financed, and not as a
finance charge, (9) failed to make any disclosure of the value given for the trade-in, (10)
failed to disclose the value given for Plaintiff's trade in, and (11) failed to disclose the
amount necessary to discharge the lien on Plaintiff's trade in.  (Compl. at ¶¶ 61-80.)

> Pursuant to the TILA:
>
> The creditor shall make the disclosures required by this subpart clearly
> and conspicuously in writing, in a form that the consumer may keep.  The
> disclosures shall be grouped together, shall be segregated from
> everything else, and shall not contain any information not directly related
> to the disclosures required under § 226.18.  The itemization of the amount
> financed under § 226.18(c)(1) must be separate from the other disclosures
> under that section.

12 C.F.R. § 226.17(a)(1).[7]

The Act requires creditors to make these TILA disclosures before consummation
of the transaction.  12 C.F.R. § 226.17(b).  The goal of TILA "is to provide 'meaningful
disclosure of credit terms so that the consumer will be able to compare more readily the
various credit terms available to him.'"  *Bragg v. Bill Heard Chevrolet, Inc.,* 374 F.3d
1060, 1068 (11th Cir. 2004) (citing 15 U.S.C. § 1601(a)).  Plaintiff claims in her second
affidavit that:

> When the manager [at RTAG] had [her] sign the documents, she flipped

---

[7]Disclosures required for "closed ended" credit transactions include: (1) the
identity of the creditor; (2) the "amount financed;" (3) the "finance charge;" (4) the
"annual percentage rate;" (5) the "total payments;" (6) the number, amount, and due
dates or period of payments; (7) the total sale price; (8) descriptive explanations of
specified terms; and (9) where credit is secured, a statement that the security interest
has been taken.  15 U.S.C. § 1638(a)(1)-(9).  Further disclosures are required in certain
circumstances by § 1638(a)(10)-(14).  *Baker v. Sunny Chevrolet, Inc.*, 349 F.3d 862,
872, n. 1 (6th Cir. 2003).

> each one up and rushed through the process so that most of the pages
> were covered up; [and she] did not get to review the documents before
> [she] signed them, nor did [she] get a copy of any documents prior to
> signing them.  While she did tell me what the documents were that I was
> signing, I did not get to have or keep or even read any of them at the time.

(Pl.'s Aff. at ¶ 12).  Plaintiff asserts that "[t]he TILA disclosures, provided within the retail

installment contract do not reflect the legal obligations of the parties which is a

requirement of the TILA."  (Pl.'s Resp. at 14.)  Plaintiff contends that "RTAG wanted the

best of both worlds; it wanted to lock Mrs. Gillom into a credit sale, while at the same

time, maintain its own ability to treat the sale as conditional and get out of its promise to

extend credit at any time."  (*Id.* at 2.)  Plaintiff maintains that "RTAG provided [Plaintiff]

with written disclosures *only after* the retail installment sales contract had been

executed, that is, after consummation - and these disclosures were not even accurate."

(*Id.* at 6.) (emphasis supplied).  Plaintiff argues that "mere cursory verbal review or

explanation of what a document is does not comply with the plain language of the

statutory and regulatory mandate" and "the consumer must be given a copy of the

disclosures before signing the contract."  (*Id.* at 6-8.)  In sum, Plaintiff's argument is that

Defendant "did not give . . . [Plaintiff] a copy of the disclosures in writing in a form . . .

she could keep before consummation of the transaction."  (*Id.* at 8.)  Defendant, in

reliance on its Exhibit A, a Bank One document, asserts that it made the appropriate

TILA disclosures to Plaintiff, including the finance charge, annual percentage rate,

amount financed, and itemization of the total sale price.  (Def.'s Mot. at 5, Ex. A, Bank

One Document; Thayer Dep. at 55-56.)[8]  Additionally, Defendant argues that "[t]here is

---

[8]The court takes note that the "itemization of amount financed," "finance charge,"
"annual percentage rate," "total of payments," and "total sale price" are listed on the

8

no evidence that if plaintiff resigned the contract on a later date, that the finance charge would have been different.  In fact, Mr. Thayer has testified that all terms would have remained the same." (*Id.* at 6.)  Despite Plaintiff's insistence that she did not receive nor even review these documents before she left the dealership, Plaintiff's signature is reflected on the Contract.  (*See* Def.'s Mot. at Ex. A.)  Plaintiff, however, in reliance on a Fourth Circuit case, *Polk v. Crown Auto, Inc.*, 221 F.3d 691 (4th Cir. 2000) argues that Plaintiff's signature on the documents is not enough, and describes *Polk* as "a case which is almost identical to the instant matter; it is factually and legally on point."  (Pl.'s Resp. at 11.)  The *Polk* court stated that:

> [T]he sole question in this appeal is whether a seller is required to make the required disclosures in writing and in a form the consumer can keep before consummation, or whether Regulation Z is satisfied as long as the disclosures are made in some form before consummation and the consumer later receives the disclosures in writing, in a form that he can keep.

*Polk*, 221 F.3d at 692.[9]  In resolving the issue, the *Polk* court held that:

> Not only are we satisfied that this is the plain meaning of the provision, but this interpretation comports with Congress' intent to require "meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him." 15 U.S.C. § 1601(a).  By having the terms of credit disclosed in a form that he can take with him, the creditor can more readily compare those terms to the terms offered by other sellers.  Moreover, the language of the statute also supports this position.  *See* 15 U.S.C. § 1638(b)(1) (stating "the disclosures required under subsection (a) shall be made before the credit is extended").

---

Bank One document.  (*See* Def.'s Mot. at Ex. A.)

[9]As a point of clarification, in *Polk*, the defendant dealership "explained the credit terms to the plaintiff, but did not disclose the terms to him in writing in a form he could take with him."  *Id.* at 691.  In the instant case, there is no dispute that Plaintiff was at least presented with the disclosures in writing, even if she did not read them.

9

*Polk*, 221 F.3d at 692.  The *Polk* court's reasoning is reflected in the Western District of

Michigan's holding in *Lozada v. Dale Baker Oldsmobile, Inc.*, 197 F.R.D. 321 (W.D.

Mich. 2000).  In *Lozada*, the plaintiffs asserted that "Dale Baker Olds failed to comply

with Regulation Z because, while Dale Baker Olds showed written disclosures to

plaintiffs prior to their signing, it failed to provide those disclosures 'in a form that the

consumer may keep' prior to plaintiffs becoming contractually obligated to pay."  *Id.* at

336-37 (citing 12 C.F.R. §§ 226.17(a)(1), (b).)  The *Lozada* court held:

> Were the court to accept the position of Dale Baker that the regulation
> required only that consumers be shown the disclosures before becoming
> contractually obligated, the phrase "in a form that the consumer may
> keep" would be rendered meaningless. In other words, if the regulation
> means no more than that disclosures be made to consumers in writing, no
> additional meaning would be conveyed by requiring the form be one the
> consumer could keep.

*Id.* at 337.

Defendant has pointed to its Contract, which reflects that all of the terms it asserts

were disclosed, inasmuch as the Bank One document lists the itemization of the amount

financed, finance charge, annual percentage rate, total payment amount, and the total

sale price.  On the other hand, Plaintiff has presented evidence, in the form of her

deposition testimony, that she was not given the disclosures in a form she could keep, as

it was not until her husband visited the dealership at a later date that she was given the

disclosures.[10]  In light of *Lozada*, the court will deny summary judgment to Defendant on

---

[10]In her deposition testimony, Plaintiff testified that Defendant dealership told her
that "the deal didn't go through because they didn't charge [her] enough for the car, and
[she] would have to re-do the paperwork."  (Pl.'s 2nd Aff. at ¶ 22.)  Defendant has
produced evidence, in the form of Ralph Thayer's deposition testimony, that the terms
nor price of the vehicle was going to change.  (Thayer Dep. at 55-56.)  Thayer testified
in his deposition that he "told her specifically that the term was not changing, the

10

Count I of Plaintiff's complaint.

## B. Count II - Equal Credit Opportunity Act ("ECOA")

Both Plaintiff and Defendant have moved for summary judgment on Plaintiff's ECOA claim.  The Act prohibits creditors from discriminating against any credit applicant "with respect to any aspect of a credit transaction . . . on the basis of race, color, religion, national origin, sex, or marital status." *Id.* (citing 15 U.S.C. § 1691(a)(1)).  The ECOA also contains notice requirements, providing that an applicant for credit "against whom adverse action is taken shall be entitled to a statement of reasons for such an action from the creditor." 15 U.S.C. § 1691(d).  An aggrieved applicant may bring a civil action against "any creditor who fails to comply with any requirement imposed under [the Act]." 15 U.S.C. § 1691e. The ECOA's purpose is to "eradicate credit discrimination waged against women, especially married women whom creditors traditionally refused to consider for individual credit." *Mays v. Buckeye Rural Elec. Coop., Inc.*, 277 F.3d 873, 876 (6th Cir. 2002) (citations omitted).

Plaintiff argues that "[b]ecause of its false approval initially, and its subsequent failure to provide an adverse action notice, . . . Defendant is liable under the ECOA." (Pl.'s Mot. at 6.)  On the other hand, Defendant argues that "RTAG did not take an adverse credit action against the plaintiff in this matter" and contends that the "disagreement in this matter is essentially a breach of contract issue, not an equal credit opportunity issue."  (Def.'s Mot. at 7-8.)

---

interest rate was not changing, and the payment was not changing, and the only thing [that had to be done] was take the lease turn-in off the paperwork and have her re-sign it."  (*Id.* at 55.)

11

The initial issue that the court must resolve is whether Defendant is a creditor under the ECOA and, if so, what implications follow from the particular type of creditor that Defendant is.  The applicable section of the ECOA requires a creditor to provide notice of action taken on a credit application within thirty days after receipt of a completed application.  15 U.S.C. § 1691(d)(1).  The Act defines a creditor as "any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit."  15 U.S.C. § 1691a(e).  A creditor under the Act also includes "a creditor's assignee, transferee, or subrogee who so participates."  12 C.F.R. § 202.2(l).  Moreover, the term includes "a person who, in the ordinary course of business, regularly refers applicants or prospective applicants to creditors, or selects or offers to select creditors to whom requests for credit may be made."  *Id.; see also Lewis v. ACB Business Services, Inc.*, 135 F.3d 389, 407-08 (6th Cir. 1998).  In addition, as there is no Sixth Circuit law quite on point that the court has been able to identify, the court will rely on the Seventh Circuit's analysis in *Treadway v. Gateway Chevrolet Oldsmobile Inc.*, 362 F.3d 971 (7th Cir. 2004).  The *Treadway* court held that "[a] person is not a creditor regarding any violation of the Act or this regulation committed by another creditor unless the person knew or had reasonable notice of the act, policy, or practice that constituted the violation before becoming involved in the credit transaction."  *Id.* at 978 (citing 12 C.F.R § 202.2(l)).  The *Treadway* court specifically addressed a car dealership's standing in

12

relation to the ECOA.[11]  The *Treadway* court noted that "a long line of Illinois district court cases . . . have held that automobile dealerships are 'creditors' for purposes of the ECOA because they regularly refer applicants to lenders . . .  However, . . . one who regularly refers applicants to lenders is a 'creditor' under the ECOA only for purposes of 12 C.F.R. § 202.4(a) (discrimination) and (b) (discouragement).  *Id.* at 979 (internal citations omitted).)  The *Treadway* court explicitly states that a car dealership is "considered a 'creditor' [beyond referring applicants to lenders] if it 'regularly participates in a credit decision, including setting the terms of the credit.'"  *Id.*  The *Treadway* court provides the following examples of what it means for a car dealership to sets the terms of credit: (a) insisting on more money down; (b) requesting that the applicant find a cosigner; (c) lowering the price of the car in order to lower the loan-to-value ratio; and (d) regularly setting the annual percentage rate (APR) associated with the sale.  *Id.* at 980. On page 4 of its motion for summary judgment, Plaintiff asserts that "[Defendant] is a creditor under the ECOA because of the extensive role it played in the credit decision process" and it "had sole decision-making power in what assignment terms were acceptable because it could always have chosen to sell [the] credit contract for less than face value or accept payments itself from [Plaintiff]."  (Pl.'s Mot. at 4.)  In addition, in her

---

[11]In *Treadway*, the defendant car dealership reviewed the plaintiff's credit report and determined that "it would be futile to send her application to any lender[, but] [i]nstead of notifying her of this decision, . . . [the dealership] indicated that it could get her financing if she had a cosigner."  *Id.* at 973.  The Seventh Circuit framed the issue before the court as follows: "Therefore, we must decide as a matter of first impression whether an automobile dealership's unilateral decision not to submit a credit application to any lender constitutes an 'adverse action' for purposes of the ECOA."  *Id.* at 975. The *Treadway* court concluded that "[b]y unilaterally deciding not to send [the plaintiff's] application to any lender, [the car dealership] effectively denied credit to [the plaintiff]." *Id.* at 976.

statement of facts, Plaintiff asserts that Defendant "made a decision as to which of these lenders to ultimately submit the installment contract for assignment." (*Id.* at vi.)  Beyond these statements, as Defendant asserts in its response brief, Plaintiff has not "present[ed] any evidence that [Defendant] had any input into the credit decision of any of the credit companies," *see* Def.'s Resp. at 1, or "participated" in the credit decision as defined by *Treadway.  Treadway*, 362 F.3d at 979.  Again, in reliance on non-binding, but persuasive, Seventh Circuit precedent*,* when applying *Treadway,* Plaintiff can maintain a cause of action against a car dealership such as Defendant only for a claim of discrimination or discouragement.  As a matter of law, neither of these sections are applicable in this case as Plaintiff has neither alleged nor presented evidence showing that RTAG discriminated against Plaintiff on a prohibited basis or discouraged Plaintiff from obtaining credit.[12]  Therefore, the court will grant summary judgment in favor of Defendant and against Plaintiff on Count II of Plaintiff's complaint.

## C.  Count III - Fair Credit Reporting Act ("FCRA")

Both parties have moved for summary judgment on Plaintiff's FCRA claim.  In her complaint, Plaintiff argues that Defendant "failed to issue [an] . . . adverse action notice to [Plaintiff]" and therefore RTAG violated the FCRA.  (Compl. at ¶ 102.)  Defendant argues that "RTAG is not a consumer reporting agency, nor did it prepare a credit report

---

[12]Section 202.4(a) of the Act is entitled "discrimination" and states that "[a] creditor shall not discriminate against an applicant on a prohibited basis regarding any aspect of a credit transaction."  Section 202.4(b) of the Act is entitled "discouragement" and provides that "[a] creditor shall not make any oral or written statement, in advertising or otherwise, to applicants or prospective applicants that would discourage on a prohibited basis a reasonable person from making or pursuing an application." See 12 C.F.R. §§(a)-(b).

14

regarding the plaintiff" and therefore Count III of Plaintiff's complaint "must be dismissed for failure to state a claim."  (Def.'s Mot. at 8.)

The FCRA, a subchapter of the Consumer Credit Protection Act, "requires consumer reporting agencies to adopt reasonable procedures for meeting the needs of the business community without sacrificing accuracy or confidentiality, thus operating in a manner which is fair and equitable to the consumer."  *Williams v. Equifax Credit Information Services*, 892 F. Supp. 951, 953 (E. D. Mich. 1995) (internal citations omitted).  The "FCRA enables consumers to protect their reputations, and to protect themselves against the dissemination of false or misleading credit information."  *Matthiesen v. Banc One Mortg. Corp.*, 173 F.3d 1242 (10th Cir. 1999) (internal citations omitted).

The FCRA imposes civil liability on the user of credit information for willful or negligent noncompliance with any provision of the Act.  15 U.S.C. § 1681n-o.  Under sections 1681n and 1681o of the FCRA, for allegations of willful and negligent misuse or acquisition of a consumer report, the plaintiff must prove that (1) there was a consumer report, (2) that defendants used or obtained it, and (3) that they did so without a permissible statutory purpose.  *Phillips v. Grendahl*, 312 F.3d 357, 364 (8th Cir. 2002)).  The plaintiff must also prove the defendants acted with the specified level of culpability, which is willfulness under section 1681n and negligence under section 1681o.  *Id.*

Defendant argues that "15 U.S.C. § 1681 is not applicable to . . . RTAG [because it is] not a consumer reporting agency, nor did it prepare a credit report regarding the plaintiff."  (Defs.' Mot. at 8.)  Although the FCRA applies to "any person [who] takes any adverse action with respect to any consumer that is based in whole or in part on any

15

information contained in a consumer report," *see* 15 U.S.C. 1681m(a), the facts of this case do not fit within the purview of the Act.   Defendant argued that the documents relating to the contract were inaccurate from its perspective, and therefore the contract could not be completed.  In this regard, Defendant has argued that it merely wanted Plaintiff to re-sign the paperwork she had already signed, without a modification to the terms of the agreement - an argument that it has supported with Adam Thayer's deposition testimony.  On the other hand, Plaintiff has testified in her affidavit that she was told that the dealership did not charge her enough.  Despite the discrepancy between Defendant's and Plaintiff's evidence on the matter, it is not clear to the court if the adverse action Plaintiff is referring to concerns the request that Plaintiff re-sign the contract or the repossession of the Elantra, and therefore what evidence is relevant in relation to this claim.  Because the court is unable to independently fill in the gaps in Plaintiff's argument and cannot ascertain the overlap between the facts as argued and the FCRA, the court will deny both parties' motion for summary judgment relating to Count III of Plaintiff's complaint.[13]

### D.  Count V - Motor Vehicle Sales Finance Act (MVSFA)

Both Plaintiff and Defendant have moved for summary judgment on Plaintiff's MVSFA claim.  Relating to this claim, Plaintiff alleges that RTAG violated the MVSFA

---

[13]Plaintiff actually brought her FCRA claim under 15 U.S.C. § 1681o and n.  The court assumes, however, that Plaintiff intended to bring her claim relating to Defendant taking adverse action and not informing Plaintiff as a cause of action under § 1681m, not n or o, as Plaintiff refers to that section of the act in her motion.  Under 15 U.S.C. § 1681m(a), any user of a consumer report who takes adverse action as to a credit application must provide to the consumer notice of the adverse action.  15 U.S.C. § 1681m(a).

because it "failed to properly include in the retail installment contract each and every one of the material terms of the installment sale, and omitted the single most relevant term, namely whether the deal was final or conditional." (Pl.'s Mot. at 8.) Plaintiff further contends that "Defendant dealership cannot point to anything in the installment contract or any other document in the record that would have required Mrs. Gillom to come back and re-sign any paper work." (*Id.* at 9.) In addition, Plaintiff asserts that the "scheme which took place in this case is a well known one called 'spot delivery.'" (*Id.*)[14] Defendant argues that "the required information was disclosed in the installment contract." (Def.'s Mot. at 9.)

Pursuant to Mich. Comp. Laws § 492.112(a), "[a]n installment sale contract shall be in writing, and shall contain all of the agreements between the buyer and the seller relating to the installment sale of the motor vehicle sold, and shall be signed by both the buyer and the seller." Mich. Comp. Laws § 492.112(a). The Act's "predominant purpose is to set forth licensing and procedural requirements governing a motor vehicle installment sale. Briefly, a person may not engage in the sale of motor vehicles under installment contracts unless the seller is licensed in accordance with the terms of the act." *King v. Ford Motor Credit Co.*, 668 N.W.2d 357, 365 (Mich. Ct. App. 2003) (citing MCL 492.103). The Act clearly provides for the "'right of repossession of a motor vehicle' as long as the vehicle is repossessed in accordance with § 9503 of the Uniform

---

[14]At the hearing conducted in this matter, the court discussed with Plaintiff's counsel the concept of "spot delivery." The deal at issue in this case consumed a period of nearly two weeks, considerably different than counsel's description of a typical "spot delivery," i.e., an on-the-spot, or immediate, delivery scenario. (See Hrg. Tr. at 4-5.)

17

Commercial Code (UCC), Mich. Comp. Laws § 440.9503. MCL 492.114(c).  Section

9503 of the UCC provides that '[u]nless otherwise agreed a secured party has on default

the right to take possession of the collateral.'"  Mich. Comp. Laws § 440.9503.  *Brown v.*

*Detroit Federal Employees Credit Union,* No. 230218*, 2002 WL 866722, at *4 (Mich. Ct.

App. April 26, 2002).

        Plaintiff claims a violation of the MVSFA because Defendant did not note in the

retail installment contract it drafted that in the future Plaintiff would have to return to the

dealership to sign a new contract and that Defendant therefore had no right to repossess

the vehicle.  Plaintiff contends that RTAG "cannot point to anything in the installment

contract or any other document in the record that would have required [Plaintiff] to come

back and re-sign any paper work," but Plaintiff has not produced evidence or cited to

case law that suggests that such a "condition" must be noted within the Contract.  (*Id.* at

9.)  Defendant's only statement on the matter, without citation to case law,  is that the

"required information was disclosed in the installment contract."  (Def.'s Mot. at 9.)  The

court, therefore, will deny both parties' motion for summary judgment relating to Plaintiff's

MVSFA claim.

### E.  Count VI - UCC Article 9

        Both parties have moved for summary judgment on Plaintiff's Article 9 claim.

Relating to her Article 9 claim, Plaintiff argues that Defendant failed "to send a proper

notice of intent to dispose of the property to Ms. Gillom" and "violated UCC Article 9."

(Compl. at ¶ 122.)  More specifically, Plaintiff asserts that Defendant was never entitled

to repossess the vehicle as Plaintiff was never in default, because "[w]hen Defendant

repossessed the Elantra, Plaintiff did not owe a payment.  Defendant is unable to point to any document that states Plaintiff was required to re-sign paperwork."  (Pl.'s Mot. at 9.) Plaintiff maintains that "[r]efusing to re-sign paperwork that significantly changed the terms of a binding agreement is not a default under the terms of the contract."  (*Id.*) Defendants' sole response to Plaintiff's allegation is that "Plaintiff has failed to identify the right Ms. Gillom had to [the] Elantra since the contract was rescinded by RTAG. Since Ms. Gillom would not have possessory rights to this vehicle, the claimed repossession was not improper."  (Def.'s Resp. at 4.)

Plaintiff argues that "[r]efusing to re-sign paperwork that significantly changed the terms of a binding agreement is not a default under the terms of the contract" and that "Plaintiff did absolutely nothing to be in default of the contract."  (Pl.'s Mot. at 10-11.) Plaintiff concludes that "Defendant repossessed the car illegally and violated Article 9 of the Michigan UCC."  (*Id.* at 11.)

On the other hand, Defendant argues that "[P]laintiff could have retrieved the Voyager at any time.  In fact, [Plaintiff] was requested to retrieve the Voyager on many occasions."  (Def.'s Mot. at 10 (citing Pl.'s Dep. at 46).)  Defendant maintains that "[t]he title to either vehicle was never transferred.  The Voyager remained titled to the plaintiff and Daimler-Chrysler and the Elantra remained titled to RTAG.  No payments were made on any agreement by Ms. Gillom."  (*Id.*)

Mich. Compl. Laws § 440.9611 provides that "a *secured party* that disposes of collateral under section 9610 shall send to the persons specified in subsection (3) a reasonable authenticated notification of disposition."  Mich. Compl. Laws § 440.9611(b)(2) (emphasis added).  Defendant, however, never became a secured

19

creditor and is therefore not covered by the Act. *Id.* The court will, therefore, grant Defendant's motion as to this count of Plaintiff's complaint and will deny Plaintiff's motion on this count.

### F. Count VII - Michigan Vehicle Installment Sales Contract Act ("MVISCA")

Both parties have moved for summary judgment on Plaintiff's MVISCA claim. Plaintiff alleges that "the record's undisputed evidence shows that Mrs. Gillom did not receive her contract at the time it was signed or at any time on June 21, 2004" and Defendant is therefore liable under the MVISCA. (Pl.'s Mot. at 12.) Essentially, Plaintiff argues that RTAG failed to provide her with a copy of the retail installment contract at the time of the sale, thus violating Mich. Comp. Laws § 566.302. Mich. Comp. Laws § 566.302 provides in part that "[e]very retail installment sale of a motor vehicle shall be evidenced by an instrument in writing signed by the retail buyer and a copy thereof shall be delivered to him by the retail seller at the time of its execution." Mich. Comp. Laws § 566.302. In response, Defendant states only that "Plaintiff testified that when her husband picked up the vehicle, he was given all the paperwork." (Def.'s Resp. at 4 (citing Pl.'s Dep. at ¶ 25).) Defendant, however, does not present case law or other authority that supports Defendant's position that Plaintiff's husband being given "all the paperwork," *see* Def.'s Resp. at 4, on a date after Plaintiff signed the documents constitutes Plaintiff being delivered the instrument "at the time of its execution." Mich. Comp. Laws § 566.302. In other words, Defendant does not address Plaintiff's argument that she did not receive the disclosures *at the time she signed the disclosures*. By definition, the "execution of [an] instrument" is the "completion of instrument, including signing and delivery" and "includes performance of all acts necessary to render

20

instrument complete and of every act required to give instrument validity or to carry it into effect." Blacks Law Dictionary (6th Ed. 2004). Moreover, the court finds instructive the Honorable Douglas Hillman's statement in *Lozada* that "[b]ecause Dale Baker did not provide a copy of the RISC, including the disclosures, to each plaintiff class member at the time of signing, plaintiffs contend they are entitled to summary judgment under the MVISCA. I agree. Defendant does not dispute that it failed to deliver a copy of the RISC at the time plaintiffs 'executed' their agreements, as required by the MVISCA." *Lozada*, 197 F.R.D. at 340. Likewise, in the instant case, Defendant points to Plaintiff's testimony that "when her husband picked up the vehicle, he was given all the paperwork," (Def.'s Resp. at 4), and Plaintiff has specifically testified that she did not receive a copy of the documents to take with her after she signed them. (Pl.'s 2nd Aff. at ¶ 13.) Based on this evidence, no reasonable jury could determine that Plaintiff received the paperwork at the time of its execution (the time of signing) as required by the MVISCA. Therefore, the court will deny Defendant's motion and grant Plaintiff's motion on this count.

### IV. CONCLUSION

IT IS ORDERED that Plaintiff's "Motion for Partial Summary Judgment" [Dkt. # 49] is GRANTED IN PART.[15] The motion is granted as to Count VII of Plaintiff's Complaint and denied in all other respects.

IT IS ALSO ORDERED that Defendant's "Motion for Summary Judgment" [Dkt. # 48] is GRANTED IN PART. The motion is granted as to Counts II and VI of Plaintiff's

---

[15]The court will not grant Plaintiff's motion for summary judgment as to Defendant's affirmative defenses because Plaintiff does not identify specific evidence in support of her request.

21

Complaint and denied in all other respects.


  S/Robert H. Cleland                            
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE


Dated:  August 2, 2006


I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, August 2, 2006, by electronic and/or ordinary mail.


  S/Lisa Wagner                                 
Case Manager and Deputy Clerk
(313) 234-5522